**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 4, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

RALPH MARCUS HARDY,

      Plaintiff - Appellee,

v.

RABIE, Deputy; DEHERRERA,
Detention Specialist,

      Defendants - Appellants,

and

TWO UNKNOWN MASKED
DEPUTIES; ADAMS COUNTY, a
municipality; RICHARD
REIGENBORN, Sheriff, in his
individual capacity; GENE CLAPS,
Sheriff, in his official capacity;
OVERMYER, Deputy, ADA
Coordinator,

      Defendants.

No. 24-1138

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CV-02843-WJM-MDB)**

_____

Michael A. Sink (Kerri A. Booth, with him on the briefs), Adams County
Attorney's Office, Brighton, Colorado, for Defendants-Appellants.

Kevin E. Jason, NAACP Legal Defense & Educational Fund, Inc., New York, New York (Samuel Spital and Arielle Humphries, NAACP Legal Defense & Educational Fund, Inc., New York, New York, and Christopher Kemmitt, Molly Cain, and Kacey Mordecai, NAACP Legal Defense & Educational Fund, Inc., Washington, D.C., with him on the brief), for Plaintiff-Appellee.

---

Before **MATHESON**, **BACHARACH**, and **FEDERICO**, Circuit Judges.

---

**FEDERICO**, Circuit Judge.

---

In 2021, Ralph Marcus Hardy was housed as an inmate at Adams County Detention Facility (ACDF) in Colorado. During this time, he was confined to a wheelchair. He alleges that after falling from his wheelchair and suffering serious injury, jail officials refused to assist him despite his repeated requests for medical attention.

Two of these jail officials, Deputy Dennis Rabie and Detention Specialist Daniel DeHerrera, moved to dismiss Hardy's claims against them on the grounds that they had qualified immunity. The district court held that Hardy plausibly alleged that Deputy Rabie and Detention Specialist DeHerrera violated his clearly established Fourteenth Amendment rights, and thus that they are not entitled to qualified immunity. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

## A

The facts of this case are presented as alleged by Hardy in the light most favorable to him, giving him the benefit of every reasonable inference therefrom. *See Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002). In September 2022, Hardy was an inmate at ACDF on pretrial detention. During this time, he was confined to the use of a wheelchair.[1]

On September 22, Hardy fell out of his wheelchair in his cell. He was attempting to get around a barrier to the toilet in his cell and fell as he tried to transfer himself. Hardy was then unable to pick himself back up from the floor because of an "injury in his lower back, which is permanent in nature." Aplt. App. I at 24. Hardy's cellmate pressed an "emergency distress button" in the cell designed to call for help. *Id.* Hardy alleges that his cellmate pressed the button three times over a period of 30 to 45 minutes, but no help arrived.

Detention Specialist DeHerrera was on duty at the time in a control tower and received signals from the emergency distress button. Instead of notifying deputies of an emergency or responding himself, Detention

---

[1] Hardy alleges that he was forced to use a wheelchair because of injuries sustained after two unknown sheriff's deputies attacked him. This claim has not been raised on appeal.

Specialist DeHerrera allegedly ignored the emergency distress signals coming from Hardy's cell. Hardy was later told by another jail official, Deputy Chavez (not named as a defendant), that Detention Specialist DeHerrera's unit does not respond to emergency distress calls because "some inmates abuse the buttons, and they are not going to spend their entire shift chasing buttons." *Id.* at 26.

Hardy alleges that he "remained [on] the floor of his cell for nearly an hour, or more in severe pain, and suffering, and had degradingly soiled himself because of the pain and inability to move." *Id.* at 24. After it became clear that jail officials were not coming, Hardy's cellmate helped him back into his wheelchair. However, Hardy states that this "[put] him in more pain" and that he was placed back in a "contorted seated position in the wheelchair." *Id.* at 24–25. As such, the efforts of Hardy's cellmate caused him to be "further injured[.]" *Id.*

Roughly ninety minutes after he fell, Deputy Rabie came to Hardy's cell as an escort for the inmate porters who were bringing him dinner. Deputy Rabie opened the cell door and "found [Hardy] in the same contorted position and in extreme pain." *Id.* at 25. Deputy Rabie asked what had happened to him, and Hardy explained that he had fallen and "verbally declared a medical emergency." *Id.* Deputy Rabie did not take Hardy to

receive medical care, and instead told him to "file a grievance" before closing his cell. *Id.*

After an unspecified amount of time, there was a "shift change" and Deputy Chavez came by Hardy's cell with a nurse to pass out evening medication. Deputy Chavez and the nurse then rendered medical attention.

## B

Hardy filed this action pro se under 42 U.S.C. § 1983 against multiple defendants including Deputy Rabie and Detention Specialist DeHerrera in their individual and official capacities.[2] In this appeal, we are only asked to consider Hardy's deliberate indifference claims with respect to Deputy Rabie and Detention Specialist DeHerrera.

Hardy claimed that Deputy Rabie and Detention Specialist DeHerrera were deliberately indifferent to his medical needs under the Fourteenth Amendment's right to due process. Deputy Rabie and Detention Specialist DeHerrera filed motions to dismiss under Federal Rule of Civil

---

[2] In his amended and operative complaint, Hardy made four different claims in total against various defendants: (1) failure to protect and excessive force against Adams County, the current and former sheriffs, and two unknown deputies; (2) deliberate indifference and cruel and unusual punishment against Adams County, the sheriffs, Deputy Rabie, Detention Specialist DeHerrera, and Deputy Jennifer Overmyer; (3) discrimination in violation of Title II of the Americans with Disabilities Act (ADA) against Adams County, the sheriffs, and Deputy Overmyer; and (4) retaliation in violation of the First Amendment against Adams County and the sheriffs.

Procedure 12(b)(6), arguing that they are entitled to qualified immunity. The magistrate judge recommended denying their motion to dismiss, finding that Hardy's complaint sufficiently alleged that both defendants acted with deliberate indifference. Over defendants' objections, the district court adopted the recommendations of the magistrate judge with respect to the motion to dismiss claims against Deputy Rabie and Detention Specialist DeHerrera. Deputy Rabie and Detention Specialist DeHerrera then filed this timely appeal.

## II

We review de novo the district court's denial of a Rule 12(b)(6) motion to dismiss based on qualified immunity. *See Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013). "Dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Gaines*, 292 F.3d at 1224 (quoting *Curley v. Perry*, 246 F.3d 1278, 1281 (10th Cir. 2001)). "In determining whether a dismissal is proper, we must accept the allegations of the complaint as true and construe those allegations, and any reasonable inferences that might be drawn from them, in the light most favorable to the plaintiff." *Gaines*, 292 F.3d at 1224. To state a claim, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp.*

6

*v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"In addition, we must construe a pro se appellant's complaint liberally." *Gaines*, 292 F.3d at 1224. Nonetheless, this court has "repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994)).

## III

"The doctrine of qualified immunity shields government officials . . . from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1277 (10th Cir. 2008) (quoting *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007)). "A § 1983 defendant's assertion of qualified immunity is an 'affirmative defense [that] creates a presumption that the defendant is immune from suit.'" *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (alteration in original) (quoting *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020)). "To survive a motion to dismiss based on qualified immunity," the burden is on the plaintiff to "allege sufficient facts

that show—when taken as true—the defendant plausibly violated his constitutional rights, which were clearly established at the time of violation." *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).

Deputy Rabie and Detention Specialist DeHerrera argue both that (1) Hardy has failed to allege facts showing that they violated his constitutional rights, and (2) even if his rights were violated, those rights were not clearly established. We consider each of these issues in turn.

## A

We first ask whether Hardy's constitutional rights were violated. Jail officials violate a detainee's constitutional rights through deliberate indifference whenever they knowingly ignore a "substantial risk of serious harm" to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828–29 (1994). "Deliberate indifference has objective and subjective components." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). To meet the objective component, the harm suffered must be "sufficiently serious" to implicate the Eighth Amendment's prohibition of cruel and unusual punishment.[3] *Id.* Under the subjective component, "the [inmate] must show

---

[3] As a pretrial detainee, Hardy is not protected by the Eighth Amendment's prohibition of cruel and unusual punishment, but he nonetheless has the same rights through the Fourteenth Amendment Due Process Clause. *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985).

that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id.* (internal quotation marks and citation omitted).

**1**

"A medical need is considered sufficiently serious to satisfy the objective prong if the condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). Where, as here, an inmate is alleging that they were harmed by a delay in eventual medical treatment, the objective component of harm "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* at 1193 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Thus, this standard can be satisfied merely by "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." *Id.* (citation omitted).

Hardy did not describe any specific injuries sustained from his fall, nor does he name any subsequent treatment by a doctor. His complaint is sparse and fails to describe any long-term consequences resulting from the fall. The only indications of harm are his descriptions of dealing with "severe pain" and discomfort and his generic statements that he was

9

"further injured" and sustained an "injury in his lower back, which is permanent in nature." Aplt. App. I at 24–25. Still, Hardy plausibly alleges that he suffered extreme, though temporary, pain because of his fall.

Defendants concede that, accepting all of Hardy's allegations as true, Detention Specialist DeHerrera's actions caused Hardy sufficiently serious harm to meet the objective prong because he spent ninety minutes in pain before Deputy Rabie arrived. However, they argue that Deputy Rabie's actions cannot be tied to "any meaningful delay in receiving medical treatment" and thus he did not objectively violate Hardy's constitutional rights. Reply Br. at 13–14. "Certainly, not every twinge of pain suffered as the result of delay in medical care is actionable." *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000). We must determine whether Hardy has pleaded sufficiently serious pain to present an objective harm related to Deputy Rabie's actions.

Our case law on this subject generally concerns painful events that last for hours or days. *See McCowan v. Morales*, 945 F.3d 1276, 1291 (10th Cir. 2019) ("[The plaintiff] does assert that [the defendant's] delay in getting [the plaintiff] to the detention center resulted in [the plaintiff] suffering up to several hours of excruciating pain."); *Al-Turki*, 762 F.3d at 1193 ("This severe pain and fear of death lasted for several hours, during which Plaintiff was provided with neither the medical treatment that could have reduced

10

his pain nor the medical diagnosis that could have removed his fear of death."); *Sealock*, 218 F.3d at 1210 ("The pain and suffering imposed by [the defendant's] failure to get him treatment lasted several hours."); *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005) ("In the present case, [the plaintiff] presented evidence that she did in fact suffer severe pain for several days.").

Hardy's complaint alleges that when Deputy Rabie opened his cell door, he found Hardy "in extreme pain." Aplt App. I at 25. The complaint does not describe what happened between Deputy Rabie closing his cell door and him getting assistance from Deputy Chavez "[a]fter the shift change[.]" *Id.* at 26. However, he does state that Deputy Rabie "left [Hardy] in pain and suffering" implying that his pain was ongoing during this unspecified amount of time. *Id.* Even in the absence of a specific timeline, it is reasonable to infer from the alleged facts that some meaningful amount of time passed between shift changes. And under our standard of review, we must construe "any reasonable inferences" that might be drawn from Hardy's allegations "in the light most favorable to" him. *Gaines*, 292 F.3d at 1224.

There is no precise amount of suffering that makes a delay in medical care actionable. Whether pain and suffering are sufficiently serious for a deliberate indifference claim depends on context, and "[e]ven a brief delay [in medical treatment] may be unconstitutional." *Mata*, 427 F.3d at 755. We

11

read Hardy's complaint to demonstrate much more than a mere "twinge of pain" from Deputy Rabie's actions, *Sealock*, 218 F.3d at 1210, and so he has sufficiently pleaded objective harm. *See Mata*, 427 F.3d at 753 ("[T]he purpose [of the objectivity component] is to limit claims to significant, as opposed to trivial, suffering[.]").

Further, our case law has described objective harm in multiple ways. Objective harm has been characterized as either "(1) the alleged harm to the prisoner or (2) the prisoner's symptoms at the time of the prison employee's actions." *Id.* The latter is not about the ultimate harm or risk of harm, but how that harm would appear to an objective observer. *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1045 (10th Cir. 2022) ("Yet because we conclude that [the plaintiff's] earlier symptoms should prompt a layperson to seek immediate medical attention, the risk of death was an incorrect inquiry.").

Regardless of the actual amount of time in pain caused by the delay, Hardy alleged that he displayed signs of extreme pain and suffering that would be obvious to a layperson in Deputy Rabie's position. Jail officials are not given a free pass to deliberately ignore an inmate's serious medical needs simply because a shift change was forthcoming that allowed another jail official to come by and render medical attention later. *See Al-Turki*, 762 F.3d at 1194 ("The main flaw in Defendant's argument is that she is

focusing on the facts we now know about the duration and cause of Plaintiff's pain, while the pertinent question for determining her entitlement to qualified immunity depends on the facts that were known at the time."). As such, Hardy has made a sufficient showing of objective harm.

**2**

Because the objective prong has been met for both defendants, we now consider whether Detention Specialist DeHerrera was subjectively aware of a serious risk of harm to Hardy. The subjective component requires a defendant to "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Defendants argue that Detention Specialist DeHerrera could not have subjectively known that Hardy was at any risk of harm.

Hardy only alleged that Detention Specialist DeHerrera was in a control tower where he would have seen that the emergency call button was pressed three times in Hardy's cell. Although many details are missing, this allegation is still sufficient to show subjective awareness of a serious risk of

harm.[4] Deliberate indifference does not always require a direct refusal to give an inmate medical attention. A jail official exhibits deliberate indifference if he "knows that his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference[.]" *Sealock*, 218 F.3d at 1211. According to Hardy, Deputy Chavez told him that Detention Specialist DeHerrera chose not to respond to signals from emergency buttons.[5] As such, he has

---

[4] There is an inherent information asymmetry in cases such as this where an inmate cannot know what is happening outside of their cell. We maintain our pleading standards even in such cases on the understanding that "[n]ot only do prisoners ordinarily know what has happened to them; but they will have learned how the institution has defended the challenged conduct when they pursue the administrative claims that they must bring as a prerequisite to filing suit." *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010). Hardy has pursued administrative remedies and describes speaking to Deputy Chavez about the incident in his pleading. As such, his placement of Detention Specialist DeHerrera as the one monitoring the emergency call buttons appears to be more than mere speculation.

[5] Defendants argue that "[a]s a non-deputy stationed in the tower, [Detention Specialist DeHerrera] would never be called upon to leave the tower to 'chase[e] buttons.'" Op. Br. at 35–36. But they do not offer any support for this statement, and we lack a *Martinez* report that might allow us to better understand ACDF operations. *See Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir. 1991) (A *Martinez* report "aids the court in its broad reading of the pro se litigant's pleadings . . . by supplementing a plaintiff's often inadequate description of the practices that he contends are unconstitutional."). Hardy's complaint states that he learned from Deputy Chavez that Detention Specialist DeHerrera did not respond to buttons, and so the allegation is not conclusory.

alleged facts showing that Detention Specialist DeHerrera served as a gatekeeper to medical care by monitoring the emergency call buttons, and that he chose not to fulfill that duty.[6]

Seeing an emergency button go off from a cell multiple times reasonably indicates that some kind of emergency requiring a response is happening in that cell. *See Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005) ("For one thing, [the inmate] pushed an 'emergency call button,' a clear indication that an emergency was at hand."). That is not to say that ignoring an emergency button always constitutes subjective awareness of a serious risk of harm. If, for instance, Hardy or his cellmate had a known history of abusing his emergency call button and pressing it at random, Detention Specialist DeHerrera might have inferred that a button being

---

[6] Defendants urge us to extend *Lance v. Morris*, where we found that one defendant in a control tower who spoke with an inmate about a medical issue did not display deliberate indifference when he refused to get him medical attention. 985 F.3d 787, 794–96 (10th Cir. 2021). But in that case, unlike here, the defendant was able to speak with the prisoner, and the prisoner did not initially request medical attention or describe any pain. *Id.* at 795. ("According to [the plaintiff], he had only one conversation with [the defendant]. In that conversation, [the plaintiff] did not provide enough information to suggest a serious medical need[.]"). But later on, the plaintiff spoke to a different defendant in the control tower and requested medical attention. *Id.* at 797. This court found that the second defendant in *Lance* was subjectively made aware of a substantial risk of serious harm. *Id.* Here, Detention Specialist DeHerrera only knew that Hardy's cell was signaling for some kind of emergency distress, and he had no reason to presume there was not an actual emergency.

15

pressed in that cell did not indicate an actual medical emergency. But nothing in Hardy's complaint would lead us to believe that type of history was present here. We can also reasonably infer that Detention Specialist DeHerrera would have seen that the button was pressed if he was in fact in the control tower. And Hardy has alleged that Detention Specialist DeHerrera ignored the signal both because help never arrived and because Deputy Chavez told him so. As such, Hardy has sufficiently pleaded that Detention Specialist DeHerrera was subjectively aware of a serious risk of harm and nonetheless refused to fulfill his role as a gatekeeper to medical care.

**3**

As for Deputy Rabie, Defendants argue that it would not have been clear to him that Hardy needed medical attention. Deputy Rabie did not know that the emergency button had been pressed and only came by Hardy's cell to bring him dinner. Defendants argue that by this time, Hardy was sitting down in his wheelchair again and had been cleaned up by his cellmate, and thus it would not be clear that he had fallen. Hardy's complaint frames things differently.

Hardy repeatedly states that he was "obviously in pain" and sitting in a "contorted position" and that "anyone [would] see that [Hardy] was injured in some way[.]" Aplt. App I at 25–26. To support this factual picture,

Hardy alleges that Deputy Rabie did in fact ask, "what happened to him." *Id.* at 25. Hardy responded that he had fallen out of his wheelchair and "verbally declared a medical emergency[.]" *Id.*

According to the complaint, Deputy Rabie was independently aware that something was wrong, Hardy said he was having a medical emergency, and Hardy explained why he was having an emergency. Further, Deputy Rabie had no way of knowing that Hardy would be seen by a nurse after the shift change, so that fact could not have affected his subjective perception. *See Mata*, 427 F.3d at 756 ("Events occurring subsequent to [a] complete denial of medical care . . . have no bearing on whether [a defendant] was deliberately indifferent *at the time* she refused to treat [a plaintiff]."). Taking these alleged facts in the light most favorable to Hardy, as we must, we conclude that Deputy Rabie was subjectively aware of a serious risk of harm and then "disregarded that risk, by failing to take reasonable measures to abate it." *Callahan*, 471 F.3d at 1159.

**B**

Now that we have determined that Hardy's constitutional rights were violated, we consider whether these rights were clearly established. To overcome qualified immunity, a right must be clearly established such that "a reasonable official would understand that what he is doing violates that right." *Truman*, 1 F.4th at 1235 (citation omitted). "A right is clearly established when

a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Id.* (citation and internal quotation marks omitted). However, we need not find "precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Id.* (citation omitted). What we look for is whether "courts have previously ruled that materially similar conduct was unconstitutional, or if 'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct' at issue." *Buck*, 549 F.3d at 1290 (alteration in original) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

As a threshold matter, Deputy Rabie and Detention Specialist DeHerrera argue that Hardy can only demonstrate clearly established law based on four cases that he cited to the district court.[7] They argue that the magistrate judge and the district court improperly relied on four additional cases that were never raised by Hardy, and that our analysis is similarly

---

[7] *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022 (10th Cir. 2020); *Al Turki v. Robinson*, 762 F.3d 1188 (10th Cir. 2014); *Est. of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014); *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005).

confined.[8] Although plaintiffs bear the burden of showing that their rights were clearly established, *see Buck*, 549 F.3d at 1277, that does not mean that courts must blind themselves to relevant law once that argument is made. Indeed, in *Elder v. Holloway*, the Supreme Court held that a plaintiff did not need to put relevant cases into the district court record for those cases to be considered on appeal when deciding whether the law was clearly established. 510 U.S. 510, 515 (1994).

Although *Elder* concerned the Ninth Circuit limiting the scope of its own review, the principle applies equally to the proper scope of the district court's review. Whether a legal right is clearly established "presents a question of law[.]" *Id.* at 516. "A court engaging in review of a qualified immunity judgment should therefore use its 'full knowledge of its own [and other relevant] precedents.'" *Id.* (alteration in original) (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984)). Hardy has not waived any argument with respect to qualified immunity, and so, reviewing de novo, we will consider all relevant precedent. *See Cortez v. McCauley*, 478 F.3d 1108, 1122 n.19 (10th Cir. 2007) ("While it is true that Plaintiffs should cite to what constitutes clearly established law, we are not restricted to the cases cited by them."); *Cox v.*

---

[8] *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033 (10th Cir. 2022); *Lance*, 985 F.3d 787; *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019); *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000).

*Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (looking for case law not raised by the plaintiff to determine whether her rights were clearly established "[i]n the interest of thoroughness").

Availing himself of our entire case law on appeal, Hardy raises numerous on-point cases that apply to his circumstances. We conduct a brief survey of the case law here, starting with *Sealock*, where we held that prison officials violate an inmate's constitutional rights when they deliberately ignore requests for necessary medical attention and cause that inmate significant pain and suffering. 218 F.3d at 1209. In that case, the plaintiff woke up in the middle of the night and complained to prison officials of "a crushing pain in his chest" and said that he "might be having a heart attack." *Id.* at 1208. Prison officials could see the plaintiff "was sweating, vomiting[,] and appeared very pale[,]" but told him that they wouldn't take him to a hospital because it was "snowing outside and it would take time to warm up the prison van for transportation." *Id.* at 1208, 1210. The plaintiff was eventually treated for a heart attack and made a full recovery, but this court still found that the official who refused to take him to a hospital overnight acted with deliberate indifference. *Id.* at 1210.

The Tenth Circuit has since applied this principle to cases where plaintiffs suffered from less obvious instances of illness, but still experienced significant pain due to a delay in requested medical care. In *Mata*, the plaintiff

went to a prison infirmary in the evening because she was feeling severe chest pain. 427 F.3d at 750. The nurse on duty did not give her a medical assessment and told her to return the next morning when the infirmary was open. *Id.* This court found that the nurse "refused to fulfill her duty as gatekeeper in a potential cardiac emergency." *Id.* at 758.

In *Olsen v. Layton Hills Mall*, a plaintiff told jail officials when being booked that he had OCD and needed medication to avoid panic attacks. 312 F.3d 1304, 1310 (10th Cir. 2002). His medication was taken from him, and when he informed a jail official that he was having a panic attack and requested help, the official did nothing in response. *Id.* This court refused to grant the official qualified immunity on summary judgment, finding that he "may have known of—and disregarded—an excessive risk to [the plaintiff's] health." *Id.* at 1317.

More recently, in *McCowan*, we considered whether a police officer was deliberately indifferent to a plaintiff's medical needs when the plaintiff complained of severe shoulder pain. 945 F.3d at 1280. The officer held the plaintiff at a police station and delayed taking the plaintiff to a detention center where he could get medical care, causing him to suffer "up to several hours of excruciating pain." *Id.* at 1291. Even though the plaintiff did not specifically request medical care, this court found that he had plausibly alleged

that the officer was deliberately indifferent because the plaintiff repeatedly stated he was in severe pain. *Id.* at 1292.

These are only some of the many Tenth Circuit cases where we have found that prison officials display deliberate indifference by ignoring an inmate's reasonable requests for medical attention. *See also Burke v. Regalado*, 935 F.3d 960, 994 (10th Cir. 2019) (denying qualified immunity for jail officials who left plaintiff immobile in his cell and failed to render medical aid after plaintiff told them he was paralyzed); *Prince*, 28 F.4th at 1047–48 (10th Cir. 2022) (denying qualified immunity to a nurse who did not give prescribed medical care to an inmate). Even when inmates do not request medical attention, it is "clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." *Quintana v. Santa Fe Cnty. Bd. of Commissioners*, 973 F.3d 1022, 1033 (10th Cir. 2020).

As such, we have on point precedent involving materially similar conduct to the actions of Deputy Rabie, who spoke with Hardy, observed his condition and symptoms, and heard him ask for medical assistance. Defendants can only distinguish these cases by raising immaterial factual differences, such as the fact that none of them "involve back pain from a fall that had already been otherwise resolved." Op. Br. at 56–57. Given the alleged facts, however, we

have no trouble concluding that Deputy Rabie was on notice that his actions violated Hardy's constitutional rights.

But these cases provide fewer clear parallels when it comes to Detention Specialist DeHerrera, who was only aware that Hardy (or his cellmate) was pressing the cell's emergency distress button. For Detention Specialist DeHerrera, we look to other precedents involving remote requests for medical help.

In *Al-Turki*, we considered the case of an inmate who used an intercom in his cell to call for help. 762 F.3d at 1191. The plaintiff, who was known to have diabetes, told a correctional officer that "he was experiencing severe pain and nausea, and he asked to go to the medical center." *Id.* That officer then called the nurse on duty at the medical center, who said that "she would not see [the plaintiff] because it was too late and because [his] complaint was not an emergency." *Id.* The plaintiff made two more requests for medical care, both of which were also ignored. *Id.* The next morning, he passed two kidney stones and completely recovered from his pain. *Id.* at 1192. This court found that the

nurse in *Al-Turki* was not entitled to qualified immunity.[9] *Id.* at 1195.

Although she could not actually observe the plaintiff, "Defendant was aware

that severe abdominal pain, particularly in someone with diabetes, may be a

sign of any number of serious, life-threatening conditions." *Id.* at 1194.

Further, "Defendant was also aware that she was the only medical staff person

on duty and that her decision to ignore Plaintiff's request for medical treatment

would leave him without medical assistance." *Id.* The defendant violated the

plaintiff's constitutional rights because she was deliberately indifferent to

what would have appeared to be a medical emergency based on the facts as she

knew them at the time. *Id.*

We considered another intercom case in *Lance v. Morris*, this time

involving an inmate who developed a painful and potentially dangerous

priapism. 985 F.3d 787, 792 (10th Cir. 2021). Over three days, the plaintiff

reported his symptoms to multiple jail officials. *Id.* At first, he used his

intercom to call the jail's control tower and told one defendant "that he had

taken a pill and developed an erection that would not go away. But he did not

---

[9] Defendants note that the correctional officer in *Al-Turki* was granted
qualified immunity. But any comparison between the correctional officer in
that case and Detention Specialist DeHerrera is unwarranted because the
officer in *Al-Turki* did contact the medical center, and thus fulfilled his
gatekeeper duties. 762 F.3d at 1191. Deputy Rabie and Detention Specialist
DeHerrera are thus more analogous to the nurse, who did nothing in
response to the plaintiff's request for aid.

complain of pain or say that he needed to see a doctor or nurse[,]" so the defendant did not respond. *Id.* at 794. This court found that this defendant did not act with deliberate indifference because of what he learned during the call. *Id.* However, the plaintiff also called the control tower the next day while a different defendant was on duty in the tower. *Id.* at 797. This time, the plaintiff reported "his persistent erection, his need for medical attention, and the considerable pain he was experiencing." *Id.* (internal brackets and quotation marks omitted). Based on those facts, this court refused to grant summary judgment as to this defendant based on qualified immunity, given "the evidence of the call" to the control tower requesting medical attention as well as the defendant's "view of the [plaintiff's cell]" through a window. *Id.* at 798.

While these cases do not involve emergency call buttons, they demonstrate that it is deliberate indifference for jail officials to ignore calls for help even where those officials have limited information. The defendants in *Al-Turki* and *Lance* had more information than Detention Specialist DeHerrera. Both could get reports of symptoms over the intercom, and the defendant in *Al-Turki* knew the plaintiff had diabetes, while the defendant in *Lance* could partially see into the plaintiff's cell. But they also had far less information than the defendants in our other deliberate indifference cases involving jail officials who could interact with the plaintiffs firsthand. Even so, this court determined that they exhibited deliberate indifference by not taking further action in light

of the information that they had available to them. According to Hardy's complaint, Detention Specialist DeHerrera was only able to know if the emergency call button was pressed in Hardy's cell, nothing more. When Detention Specialist DeHerrera saw that it had been pressed multiple times, Hardy claims that he chose to do nothing.

This court has established a "general constitutional rule" against ignoring an inmate's requests for emergency medical attention that applies with "obvious clarity" to Detention Specialist DeHerrera's actions. *Buck*, 549 F.3d at 1290. Defendants urge against finding that a rule applies with obvious clarity "absent a high degree of factual similarity[.]" Op. Br. at 46. The Supreme Court has indeed cautioned courts "not to define clearly established law at a high level of generality" and to look to the "violative nature of *particular* conduct[.]" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). However, the question is not whether there is factual similarity, but whether "the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *D.C. v. Wesby*, 583 U.S. 48, 64 (2018) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

We differ from the dissent because we consider this question in light of the information available to Detention Specialist DeHerrera at the time he was in the control tower. In that context, the unlawfulness of his conduct flows

26

naturally from our clearly established law on deliberate indifference. Detention Specialist DeHerrera ignored a call from an emergency distress button that could have been "a sign of any number of serious, life-threatening conditions." *Al-Turki*, 762 F.3d at 1194. Under these circumstances, and as a gatekeeper to medical care and emergency response, Detention Specialist DeHerrera would have been on notice that ignoring requests for emergency assistance was a violation of an inmate's constitutional rights. The Tenth Circuit has made it "sufficiently clear that every reasonable official would have understood that" this particular conduct was unlawful.[10] *Mullenix*, 577 U.S. at 11 (citation omitted).

## IV

Neither Detention Specialist DeHerrera nor Deputy Rabie can claim qualified immunity based on the allegations contained in Hardy's complaint. Accordingly, we **AFFIRM** the ruling of the district court and **REMAND** for further proceedings consistent with this opinion.

---

[10] We also note that the Seventh Circuit has made this same determination regarding emergency call buttons. *See Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005). Although we do not consider this enough to demonstrate a clearly established weight of authority from other circuits, it is nonetheless persuasive that our sister circuit found this constitutional right to be clearly established based solely on the principles of deliberate indifference outlined by the Supreme Court in *Farmer v. Brennan. Id.* (citing 511 U.S. 825, 833 (1970)).

*Ralph Marcus Hardy v. Deputy Rabie and Deputy DeHerrera*, No. 24-1138
**BACHARACH**, J., concurring in part and dissenting in part.

The district court denied the motions to dismiss by Deputies Rabie and DeHerrera, and the majority upholds these rulings. I agree with the district court and the majority on the claims involving Deputy Rabie, but not those involving Deputy DeHerrera. In my view, Deputy DeHerrera's alleged violation of the Constitution wouldn't have been clearly established; and the absence of a clearly established violation would trigger qualified immunity. So I would reverse the denial of Deputy DeHerrera's motion to dismiss.

1.    **The plaintiff must overcome qualified immunity based on his allegations in the complaint.**

Mr. Hardy claims deliberate indifference to a serious medical condition. For this claim, the district court had to credit Mr. Hardy's well-pleaded factual allegations. *Sanchez v. Guzman*, 105 F.4th 1285, 1299 (10th Cir. 2024). These allegations state that

- Mr. Hardy fell from his wheelchair,

- his cellmate pressed the emergency button in their cell,

- Deputy DeHerrera ignored the emergency signal from Mr. Hardy's cell, and

- Mr. Hardy suffered serious pain while waiting for medical attention.

Crediting these allegations, the district court needed to decide whether the alleged facts had stated a facially plausible claim. *Strain v. Regalado*, 977

F.3d 984, 989 (10th Cir. 2020). Once the district court ruled, we would

conduct de novo review. *Id.*

But we conduct this review against the backdrop of Deputy

DeHerrera's assertion of qualified immunity. Given the assertion of

qualified immunity, we consider the objective reasonableness of Deputy

DeHerrera's conduct as alleged in the complaint. *Hemry v. Ross*, 62 F.4th

1248, 1253 (10th Cir. 2023). For this inquiry, we consider

- whether Mr. Hardy has alleged facts that would entail a
  violation of a constitutional right and

- whether this right had been clearly established.

*Est. of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir.

2016). A right is *clearly established* if the Supreme Court, the Tenth

Circuit, or the weight of out-of-circuit authority has

- held that "materially similar conduct was unconstitutional" or

- identified a rule that applies "with obvious clarity" to the facts.

*Buck v. City of Albuquerque*, 549 F.3d 1269, 1290 (10th Cir. 2008)

(quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

**2.    Our precedents wouldn't clearly establish a constitutional
violation unless the defendant had seen or heard about a
prisoner's medical condition.**

For the claim itself, Mr. Hardy could prevail only if

- he incurred a serious medical condition and

- Deputy DeHerrera knew of, and disregarded, an excessive risk to health.

*DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001). As the majority explains, Mr. Hardy plausibly alleged a serious medical condition. Maj. Op. at 10. For Deputy DeHerrera, we may assume for the sake of argument that he knowingly disregarded an excessive risk to Mr. Hardy's health. Even with that assumption, however, a constitutional violation wouldn't be clearly established because Mr. Hardy doesn't allege that

- anyone discussed the fall with Deputy DeHerrera or

- Deputy DeHerrera observed Mr. Hardy.

The missing allegations resemble the circumstances in *Lance v. Morris*, 985 F.3d 787 (10th Cir. 2021). There a prisoner developed a priapism, which is a persistent, painful erection. *Id.* at 792. The prisoner called the control tower, stating that he had developed an erection that wouldn't go away. *Id.* at 794. But the prisoner didn't complain of pain or say that he needed to see a doctor or nurse. *Id.* We concluded that even though the condition was serious, the guard in the control tower hadn't acted with deliberate indifference in the absence of evidence about what he might have seen or heard. *Id.* at 795.

Granted, we held that another officer wasn't entitled to qualified immunity at the summary-judgment stage given evidence that the officer had talked to the prisoner about the priapism and could see into the cell.

3

*Id.* at 797–98; *see* Maj. Op. at 24–25. Here, however, there's no allegation that Deputy DeHerrera saw Mr. Hardy or heard that he was in medical distress. So this holding in *Lance* wouldn't clearly show a need for medical care when the defendant hadn't talked to the inmate or seen into his cell.

Mr. Hardy and the district court have pointed to numerous other cases recognizing constitutional violations. In all of these cases, however, the defendants had either observed the injured prisoners or been told about their medical conditions. These cases consist of

- *Sealock v. Colorado*, where we denied qualified immunity to both a defendant who witnessed the symptoms of a heart attack and a defendant who had been told the plaintiff was experiencing chest pains, 218 F.3d 1205, 1210–12 (10th Cir. 2000),

- *Olsen v. Layton Hills Mall*, where we denied qualified immunity when the plaintiff notified the official of a panic attack, 312 F.3d 1304, 1316–17 (10th Cir. 2002),

- *Mata v. Saiz*, where we denied qualified immunity when a nurse had personally observed, and spoken with, the plaintiff, 427 F.3d 745, 756–59 (10th Cir. 2005),

- *Al-Turki v. Robinson*, where we denied qualified immunity when the official had been told repeatedly about the plaintiff's severe pain, 762 F.3d 1188, 1191 (10th Cir. 2014),[1]

- *Estate of Booker v. Gomez*, where we denied qualified immunity when the officials had placed the plaintiff in a

---

[1]    The majority also relies on this case, pointing to the treatment of a prison nurse. Maj. Op. at 23–24 & n.9. But the nurse was told that plaintiff had experienced severe abdominal pain and had requested medical care. *Al-Turki*, 762 F.3d at 1191. According to the complaint, Deputy DeHerrera had no comparable information as to the nature of the emergency request from Mr. Hardy's cell.

chokehold, tasered him, and put him in a holding cell, 745 F.3d 405, 414–15, 434 (10th Cir. 2014),

- *McCowan v. Morales*, where we denied qualified immunity when the plaintiff had repeatedly informed the official of a shoulder injury, 945 F.3d 1276, 1292 (10th Cir. 2019),

- *Quintana v. Santa Fe County Board of Commissioners*, where we denied qualified immunity when an official had known that the plaintiff was vomiting blood, 973 F.3d 1022, 1030–31 (10th Cir. 2020),

- *Paugh v. Uintah County*, where we denied qualified immunity when the officials were aware of symptoms that had obviously been serious, 47 F.4th 1139, 1157–65 (10th Cir. 2022), and

- *Prince v. Sheriff of Carter County*, where we denied qualified immunity when the official had (1) heard the plaintiff using incoherent phrases and (2) ignored a doctor's orders concerning the treatment, 28 F.4th 1033, 1046 (10th Cir. 2022).

In all of these cases, the prison official knew of the medical conditions by

- observing the injured or ill prisoners or

- being told about the conditions.

The same is true of the opinions that Mr. Hardy cites from other circuits: In each opinion, the guard had either observed the prisoner in medical distress or been told about it. *See Williams v. City of Yazoo*, 41 F.4th 416, 423–24 (5th Cir. 2022) (stating that the plaintiff had adequately alleged the defendants' knowledge of the medical condition based on what they had been told and their knowledge of the plaintiff's diagnosis); *Phillips v. Roane Cnty.*, 534 F.3d 531, 540–41 (6th Cir. 2008) (observing that the plaintiff was being held in a cell that the officials would have

understood as reserved for inmates undergoing medical crises); *Schaub v. VonWald*, 638 F.3d 905, 915–16 (8th Cir. 2011) (holding that an official was aware of serious medical needs when notified by a doctor).

We lack any allegations about a similar observation or statement to Deputy DeHerrera about Mr. Hardy's need for medical attention. To the contrary, Mr. Hardy argues only that Deputy DeHerrera saw and ignored an emergency notification from Mr. Hardy's cell. But Mr. Hardy hasn't cited any opinions recognizing a constitutional violation without the official's observation or notification of a prisoner who is injured or sick. As a result, Deputy DeHerrera's alleged constitutional violation wouldn't have involved a clearly established constitutional right. And in the absence of a clearly established right, I would reverse the denial of Deputy DeHerrera's motion to dismiss.